UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
MARINA A. MARTINEZ,

                    Plaintiff,

                                                    **REPORT AND**
          -against-                                 **RECOMMENDATION**

COMMISSIONER OF SOCIAL SECURITY,                    13 Civ. 159 (KMK)(JCM)

                    Defendant.
------------------------------------------------------------ X

To the Honorable Kenneth M. Karas, United States District Judge:

        Plaintiff Marina A. Martinez ("Plaintiff") commenced this action pursuant to 42 U.S.C.

§ 405(g), challenging the decision of the Commissioner of Social Security ("the

Commissioner"), which denied Plaintiff's applications for disability benefits, finding her not

disabled.  Presently before this Court are: (1) Plaintiff's motion to reverse the Commissioner's

decision or, in the alternative, vacate such decision and remand for further consideration by the

Commissioner, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)"),

(Docket No. 21); and (2) the Commissioner's cross-motion to affirm the Commissioner's

decision pursuant to Rule 12(c), (Docket No. 24).  For the reasons below, I respectfully

recommend that Plaintiff's Motion for Judgment on the Pleadings should be denied and the

Commissioner's cross-motion be granted.

## I.  BACKGROUND

        Plaintiff was born on July 15, 1962. (R.[1] 50).  From 2005 to January 23, 2010, she

worked as a home attendant. (R. 42, 128, 148).  On April 12, 2010, Plaintiff filed a disability

---

[1] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed on the Court's Electronic Document Filing System on August 2, 2013. (Docket No. 14).

insurance benefits ("DIB") application, and on April 19, 2010 she filed a supplemental security income ("SSI") application, alleging in both that she became disabled and was unable to work as of January 23, 2010 as a result of cervical and lumbrosacral radiculopathy, arthritis, depression and knee pain. (R. 50-51, 146). The Social Security Administration ("SSA") denied Plaintiff's applications on August 13, 2010. (R. 50-51). Plaintiff appealed the denial and, on July 20, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Paul A. Heyman. (R. 32-49). ALJ Heyman affirmed the denial of benefits on September 16, 2011. (R. 18-27). The Appeals Council considered additional evidence submitted following the ALJ's decision, but denied Plaintiff's request for review on December 19, 2012. (R. 1-5).

Thereafter, Plaintiff appealed the SSA's decision by filing the present action on January 3, 2013, contending that ALJ Heyman's decision was based on errors of law and was not supported by substantial evidence in the record. (Docket No. 2).

## A. Plaintiff's Medical Treatment History

The administrative record contains medical records from treatment that Plaintiff has received for back, knee, and neck pain, and symptoms relating to depression.

## 1. Records Relating to Plaintiff's Physical Conditions

Plaintiff presented at the Emergency Triage of North Central Bronx Hospital on January 22, 2010, complaining of left knee and upper back pain with an intensity of six out of ten. (R. 198). The radiology report from Plaintiff's January 22, 2010 X-ray indicated small marginal osteophytes at the medial and patellofemoral joint spaces, with no radiographically visible fracture or dislocation. (R. 212). Plaintiff's joint spaces and alignment were preserved. (R. 212). The impression was degenerative changes, (R. 212), and the summary of these results stated that

Plaintiff had mild arthritis in her knee. (R. 425).  Plaintiff was instructed to follow up with a rheumatologist regarding knee injections. (R. 425).

Plaintiff had an MRI performed on her cervical and lumbar spine and brain on January 28, 2010. (R. 218).  The MRI of her lumbar spine showed normal lumbar lordosis, normal vertebral body height and signal, with normal alignment, no destructive bony lesion and most of her discs were within normal limits. (R. 220).  At the L5/S1 disc, Plaintiff had a loss of disc signal with maintained height, and a mild posterior disc bulge causing minimal central canal and minimal bilateral neural foraminal narrowing. (R. 220).  The impression of the lumbar spine MRI was loss of normal lumbar lordosis, likely due to a muscle spasm, and mild lumbar degenerative disc disease at L5/S1. (R. 221).  The MRI of her cervical spine revealed a loss of normal cervical lordosis with mild loss of disc signal with maintained height and a tiny posterior disc osteophyte complex without central canal narrowing or neural foraminal narrowing at multiple levels. (R. 222-23).  The impression was torticollis to the right and mild cervical spondylosis with multilevel disc ostephyte complexes with a mild posterior disc bulge at C5/6. (R. 223).  The MRI of her brain showed unremarkable results. (R. 226).

On March 2, 2010, Plaintiff's physician, Dr. Ranga C. Krishna, provided a letter indicating that Plaintiff was unable to return to work because of a chronic condition. (R. 345). On March 12, 2010, Dr. Krishna completed a disability benefits claim form, indicating that Plaintiff suffered from cervical and lumbosacral radiculopathy, resulting in chronic neck, low back, and knee joint pain with decreased range of motion, marked tenderness in her cervical and lumbar spine and muscle spasms. (R. 238).  Dr. Krishna wrote that Plaintiff was unable to work because of these conditions as of January 23, 2010, and estimated that Plaintiff would be able to perform work again as of April 20, 2010. (R. 238).  Dr. Krishna submitted another form on

March 22, 2010, indicating that he had treated Plaintiff on February 23 and March 12, 2010, and would continue to have appointments with her every four to six weeks. (R. 244).

Plaintiff met with Federation Employment and Guidance Service ("FEGS") Social Worker Luz Rivera on April 16, 2010 and told her that she was able to wash dishes and clothes, sweep/mop the floor, vacuum, watch TV, make beds, shop for groceries, cook meals, read, socialize, get dressed, bathe, use the toilet and groom herself, although only when she "fe[lt] good." (R. 256).  She reported arthritis in her right shoulder, upper and lower back, both knees and in both hands, and said that she attended physical therapy two times a week. (R. 258).  She stated that she was taking Cymbalta, Naproxen Hydrocodone, Mirtazapine, and Motrin. (R. 260).  Dr. Oksana Luke at Bronx Lebanon Hospital conducted a physical examination on April 16, 2010 and found that Plaintiff had posterior cervical tenderness, lumbar tenderness, bilateral knee crepitus, and no effusion. (R. 262).

A treatment record from North Central Bronx Hospital dated May 7, 2010 indicated that Plaintiff complained of knee pain and swelling and pain in her upper back and in both upper arms. (R. 427).  She said that the pain worsened with use and was the worst at night. (R. 427).  She reported that prior physical therapy sessions had made her feel worse, that Motrin helped, but that Naprosyn helped more. (R. 427).  She stated that she got roughly two-and-a-half hours of sleep at night because she did not "get sleepy." (R. 427).  The diagnosis was fibromyalgia and knee osteoarthritis. (R. 428).  Dr. Joyce Reyes Thomas of North Central Bronx Hospital indicated that she would prescribe Cymbalta once she received approval from Dr. Ruiz, Plaintiff's psychiatrist. (R. 428).  In the meantime, she referred Plaintiff to physical therapy and prescribed Tylenol for her knee pain. (R. 428).

Dr. Steven Lager assessed Plaintiff on May 26, 2010 and also found that Plaintiff had osteoarthritis in her left knee, noting that Plaintiff's complaint was only of left knee pain and the X-rays showed mild degenerative changes of the knee. (R. 429).  He also indicated that Plaintiff's gait was normal, that she had joint line pain with palpation and a full active range of motion. (R. 429).  An X-ray on May 28, 2010 of Plaintiff's left knee showed no evidence of acute fracture, dislocation or destructive bony lesion. (R. 308).  The joint spaces were relatively well maintained and the overall impression was that there was no acute bony abnormality. (R. 308).

Dr. Krishna provided a medical assessment of Plaintiff's ability to do work-related activities on June 8, 2010. (R. 347-49).  In the assessment, he wrote that Plaintiff could lift and/or carry about one to ten pounds occasionally, and he supported this assessment by pointing to Plaintiff's cervical and lumbosacral radiculopathy and chronic progressive neck and lumbosacral pain, with MRI and EMG/NCS evidence of cervical and lumbosacral radiculopathy. (R. 347).  He also said that she could stand and/or walk for one to one-and-a-half hours in an eight-hour work day, and for fifteen to twenty minutes without interruption. (R. 348).  In support of this assessment, he pointed to the physical exam findings relating to Plaintiff's range of motion, marked tenderness of the cervical and lumbar spine, MRI-disc herniations at multiple levels, and EMG/NCS evidence of cervical and lumbar radiculopathy. (R. 348).  He noted that it was his belief that she could sit for one to one-and-a-half hours in an eight-hour day and for thirty to thirty-five minutes without interruption, could occasionally climb and balance but never stoop, kneel, crouch, or crawl, and her ability to reach, handle, and push/pull were all affected by

these impairments. (R. 348).  He also indicated that Plaintiff's acute exacerbations of symptoms

incapacitated her from doing routine daily or job-related activities.[2] (R. 349).

On September 8, 2010, Plaintiff continued to complain of pain and swelling in her left

knee, right upper back, parascapular area and right upper extremity, right elbow-lateral

epicondyle area and left knee. (R. 432).  Plaintiff received treatment at North Central Bronx

Hospital on October 2, 2010, when she appeared at the emergency room complaining of

dizziness and right shoulder/arm pain. (R. 403).  Her gait was noted to be steady and she was

able to ambulate without difficulty. (R. 402).  She was diagnosed with viral labyrinthitis, was

given medication, and she showed signs of improvement upon discharge. (R. 404).  Plaintiff saw

Dr. David H. Zelefsky at North Central Bronx Hospital on October 8, 2010 and complained of

pain in both knees, which she said was worse upon ambulating and stairclimbing. (R. 444).  She

said that she had increased pain with cold and rainy weather. (R. 444).  She had full range of

motion in both knees, joint line tenderness, mild crepitus in both knees, motor strength of 5/5 in

the lower extremities, and 4/5 in the bilateral quadriceps and hamstrings. (R. 444).  An X-ray on

October 8, 2010 demonstrated mild spurring along the tibial spine, no joint effusion or

suprapatellar bursal distention, no visible fracture or dislocation. (R. 435).  The impression was

mild degenerative changes of the left knee. (R. 435).  She was referred for physical therapy on

October 12, 2010. (R. 443).

Plaintiff had an initial physical therapy evaluation on November 15, 2010. (R. 446).  She

reported difficulty walking, although she could walk two to three blocks, going upstairs, stating

that she had to rest after two to three flights, and going from sitting to standing, all as a result of

her knee pain. (R. 446).  She also reported pain in her neck, low back, right forearm and in both

---

[2] Dr. Krishna also submitted a treating physician's wellness report dated September 17, 2012 and a medical source
statement, dated October 4, 2012, both of which post-date the ALJ's decision. (R. 639-40, 642-48).

hands. (R. 446).  She estimated that the pain was a 7-8/10. (R. 446).  Her range of motion was within normal limits, although she had pain at the end range of her left knee flexion, and her extension strength in both knees was a 4/5. (R. 446).  She attended physical therapy on November 19, November 22, and December 3, 2010. (R. 448-50).  On December 6, 2010, Plaintiff complained of bony prominence and pain in her left knee and received a referral to a fracture clinic. (R. 454).  She received physical therapy referrals on March 3, March 8, March 10, March 15, March 17, and March 22, 2011. (R. 452-53).

## 2.  Records Relating to Plaintiff's Psychiatric Conditions

At the FEGS intake on April 16, 2010, Plaintiff reported that she was diagnosed with "depression" in 2004, and that she had been treated by Dr. Peter R. Ruiz for less than one month.[3] (R. 254).  Her answers to the questionnaire resulted in a PHQ-9 score of seventeen, indicating severe depression. (R. 255).  She said that she had met with Dr. Ruiz only one time since being transferred to a new clinic on April 6, 2010, and that she had no therapist. (R. 255).  She said that when she felt depressed, she had no energy and was not able to do the house chores, read, or watch television. (R. 256).  Dr. Luke assessed that Plaintiff had recurrent major depression, was unable to work, and needed continuous treatment. (R. 265).  In a follow-up assessment on April 28, 2010, Plaintiff reported symptoms of anxiety/fearfulness, depressed mood, loss of appetite, insomnia, forgetting things, crying, and loss of interest in sex. (R. 284).  She was assessed as having mild impairments in her ability to follow work rules and accept supervision, and moderate impairments in her ability to deal with the public, maintain attention, relate to coworkers, and adapt to change and stressful situations. (R. 286).

---

[3] In the records submitted before the Appeals Council, see Section I.D., *infra*, Plaintiff included an appointment reminder for a March 27, 2010 appointment with Dr. Ruiz. (R. 572).

Plaintiff's treating psychiatrist, Dr. Ruiz, provided a letter dated September 16, 2010, indicating that Plaintiff had been under his care since April 6, 2010 and had been diagnosed with a depressive disorder, a mood disorder due to back aches, and a circadian rhythm sleep disorder. (R. 340).  He gave her a GAF score of 60, indicating moderate symptoms, but noted that she continued to report severe symptoms of depression and sleep disturbance. (R. 340).

Dr. Ruiz completed a psychiatric assessment on November 20, 2010. (R. 353-54).  He indicated that Plaintiff began treatment on April 6, 2010, although he did not state how frequently he saw Plaintiff. (R. 353).  He said that Plaintiff reported severe anxiety, as well as depressed mood, which worsened her chronic musculoskeletal aches and pains. (R. 353).  He wrote that Plaintiff's mental status showed significant findings of depressed mood and bouts of anxiety, no psychosis, no delusional thinking, but chronic insomnia. (R. 353).  He diagnosed Plaintiff with a depressive disorder, a mood disorder due to aches and pains, and a circadian rhythm sleep disorder, with a GAF of 55, indicating moderate symptoms. (R. 354).  He said that her prognosis was fair to poor, but he specified that his prognosis was related to her medical condition of chronic pain.[4] (R. 354).

Dr. Ruiz also provided a medical assessment of Plaintiff's ability to do work-related activities (mental) dated November 19, 2010. (R. 355-57).  The medical assessment indicated that Plaintiff had poor or no ability to interact with supervisors, deal with work stresses, function independently, and maintain attention and concentration, and Dr. Ruiz indicated that these limitations came from Plaintiff's difficulties with memory. (R. 355-56).  Additionally, he noted that she had poor abilities in relation to complex job instruction and detailed, but not complex,

_____

[4] Dr. Ruiz provided another psychiatric assessment on July 14, 2011, with the same exact assessments, with the exception that he gave Plaintiff a fair to guarded prognosis, indicating that Plaintiff had had "no improvement in aches and pains as well as depression." (R. 458-59).

-8-

job instructions, but fair abilities related to simple job instructions. (R. 356).  He did not list any

specific clinical findings or limitations that supported that assessment. (R. 356).  He noted that

she had fair ability to maintain personal appearance, relate predictably in social situations, and

demonstrate reliability, but poor ability to behave in an emotionally stable manner. (R. 356).  To

back up that assessment, he again pointed to Plaintiff's difficulties with memory. (R. 357).

When asked about other work-related activities, he again indicated that Plaintiff had difficulties

with memory and concentration.[5] (R. 357).

Dr. Ruiz provided another letter dated July 19, 2011, indicating that Plaintiff's

medications were Cymbalta, Remeron, and Seroquel, all of which were intended to treat

Plaintiff's symptoms of depressive disorder, a mood disorder due to her medical condition and

circadian rhythm sleep disorder. (R. 463).

## B.  Consulting Physicians

The administrative record contains evaluations by two consulting physicians.

## 1.  Dr. William Lathan

Dr. William Lathan provided an evaluation of Plaintiff in May 2010. (R. 304-07).

Plaintiff reported a history of left knee, right shoulder and right elbow pain. (R. 304).  She

indicated that physiotherapy and prescription medications had provided her with partial

temporary relief of pain. (R. 304).  She said that one local injection in her left knee was also

helpful. (R. 304).  She noted that she had intermittent pain in the coccygeal area of her back and

also in her left shoulder joint, which was aggravated by reaching and lifting with the left upper

---

[5] Dr. Ruiz completed another medical assessment of Plaintiff's ability to do work-related activities (mental) on July 14, 2011 with the same assessments, with the exception that Dr. Ruiz more specifically noted that Plaintiff had limited short term memory and had reported episodes of forgetfulness during activities of daily living. (R. 460-62).

extremity. (R. 304).  She said that she could perform all activities of personal care, but that her daughter did the cleaning, laundry and shopping. (R. 305).

During the physical examination, Plaintiff did not appear to be in acute distress, and her gait was normal. (R. 305).  She was able to walk on heels and toes without difficulty, had a full squat and normal stance and used no assistive devices. (R. 305).  She did not require help changing for the exam, getting on or off the exam table, or rising from the chair. (R. 305).  Her cervical and lumbar spine showed full flexion, extension, lateral flexion and full rotary movements bilaterally. (R. 306).  Her left shoulder was actively abducted and elevated to 100 degrees, at which point Plaintiff complained of pain. (R. 306).  The right shoulder was actively abducted and elevated to eighty degrees before Plaintiff complained of pain. (R. 306).  She had full range of motion in her hips, knees and ankles bilaterally, but complained of left knee joint pain on full range of motion. (R. 306).  Her joints were stable with the exception of her left knee. (R. 306).  The X-ray on Plaintiff's left knee was within normal limits. (R. 306).

Dr. Lathan's diagnoses were a history of left knee arthralgia, a history of bilateral shoulder arthralgias, and a history of depression. (R. 307).  His prognosis was stable. (R. 307).  He noted that Plaintiff had a moderate restriction for lifting, pushing, pulling, overhead reaching, stooping, squatting, prolonged standing, and prolonged walking. (R. 307).

**2.  Dr. Dmitri Bougakov**

Dr. Dmitri Bougakov conducted a psychiatric evaluation of Plaintiff in May 2010. (R. 300-03).  Dr. Bougakov noted Plaintiff's psychiatric treatment history, stating that she was in treatment beginning in 2004 for about two years for depression and started to see a psychiatrist again in April 2010 on a monthly basis. (R. 300).  She reported that she took Mirtazapine, Cymbalta, Tylenol, Naprosyn, Hydrocodone, and Codeine. (R. 300).  Regarding her symptoms,

Plaintiff indicated difficulty falling asleep and waking up frequently, poor appetite, loss of weight, sad moods, crying spells, loss of interest, low energy, concentration difficulties, diminished sense of pleasure and social withdrawal. (R. 300). She said that she was forgetful, forgetting to do her chores, forgetting appointments, and sometimes forgetting to eat. (R. 300). At times during the evaluation Plaintiff was tearful, but Dr. Bougakov found that her thought processes were coherent and goal directed. (R. 301). He wrote that her affect was depressed and anxious and her mood was dysthymic. (R. 301). He noted that her attention and concentration was impaired related to emotional distress related to depression, and she made mistakes on simple calculations. (R. 301). He also said that her recent and remote memory skills were impaired. (R. 301). He indicated that her intellectual functioning was in the average range, her general fund of information was somewhat limited, her insight was poor to fair and her judgment was fair. (R. 302). She stated that she was able to dress, bathe and groom herself. (R. 302). She said that she did some cooking and occasionally went shopping, but her daughter did the cleaning and laundry. (R. 302). She was able to take a bus by herself and she socialized with her friends in church, but she said that she did not spend much time with family because she was withdrawn. (R. 302). She reported occasionally watching television, listening to radio, reading, and going to church, but rarely socializing with friends. (R. 302).

Dr. Bougakov diagnosed Plaintiff with major depressive disorder (mild), arthritis, chronic spinal and knee joint pain, and hypertension. (R. 302-03). He concluded that Plaintiff was able to follow and understand simple directions and instructions and perform simple tasks. (R. 302). He also found that she could maintain attention and concentration and maintain a regular schedule on a limited basis. (R. 302). He noted that she was limited in her ability to learn new tasks and perform complex tasks. (R. 302). She could make appropriate decisions, relate

adequately with others, and deal with stress, but on a limited basis. (R. 302).  His prognosis was guarded given that Plaintiff presented with "acute psychiatric symptomatology and significant cognitive limitations that [were] associated with her psychiatric symptomatology." (R. 303).  He indicated that he believed that in the future with appropriate treatment, Plaintiff would be able to return to normal levels of functioning. (R. 303).

## C. Residual Functional Capacity ("RFC") Assessments

The state psychiatric consultant, A. Hochberg, completed a psychiatric review and Mental RFC Assessment on June 9, 2010, and determined that Plaintiff's affective disorder, major depressive disorder, did not satisfy the "paragraph A" criteria of listing 12.04. (R. 312-21). Regarding the "paragraph B" criteria, the examiner found mild limitations in activities of daily living and maintaining social functioning, moderate limitations in maintaining concentration, persistence or pace, and insufficient evidence of episodes of deterioration of extended duration. (R. 322).  The consultant found none of the "paragraph C" criteria. (R. 323).  Regarding Plaintiff's mental RFC, A. Hochberg concluded that Plaintiff had moderate limitations in the following categories: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerance; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and accepting instructions and responding appropriately to criticism from supervisors. (R. 326-27).  After reviewing the medical evidence in Plaintiff's file, the analyst concluded that Plaintiff was able to perform a job where she would have simple tasks. (R. 328).

A physical RFC assessment completed on August 13, 2010 based on the medical records in Plaintiff's file found Plaintiff could occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry ten pounds, and sit, stand and/or walk for about six hours. (R. 334-35).  Her ability to push and/or pull was found to be unlimited. (R. 335).  The assessment included no additional postural, manipulative, visual, communicative or environmental limitations. (R. 336-37).

**D.  Evidence before the Appeals Council**

Following the ALJ's decision, Plaintiff supplemented the record to include additional medical records and assessments. (R. 465-648).  These records indicated that Plaintiff attended physical therapy on November 19, November 22, December 3, and December 10, 2010. (R. 479-85).  On December 6, 2010, Plaintiff continued to complain of bilateral knee pain with walking distance and stairs, although she noted improvement from the physical therapy sessions. (R. 486).  An X-ray of her knees showed degenerative changes, and a physical examination showed a bony prominence at her left lateral knee. (R. 486).  Her passive range of motion was full. (R. 488).  She attended physical therapy again on December 13, 2010 and January 31, 2011, (R. 494-97).  On January 31, 2011, her knee pain was assessed again, and though she noted some improvement from physical therapy, she still had pain in her left knee with stairs and squatting. (R. 503).  She was additionally referred for a steroid injection in her right elbow for treatment of tennis elbow. (R. 503).  Plaintiff saw an orthopedist on March 2, 2011, who reviewed Plaintiff's prior X-rays and noted minimal degenerative joint disease in the knee, but otherwise said that it was within normal limits. (R. 510).  He diagnosed Plaintiff with Pes Anserine Bursitis, and indicated that she would likely benefit from a steroid injection and continued physical therapy. (R. 510).  On May 4, 2011, Plaintiff reported that she had gotten a cortisone injection following

the March appointment and it provided minimal relief. (R. 577).  A physical examination on that date revealed tenderness at the joint line, range of motion of 0 to 130 degrees with pain medially, painful McMurrays medially and no laxity. (R. 577).  To rule out a medial meniscal tear in her left knee, an MRI was ordered. (R. 577).

On May 26, 2011, an assessment of her cervical spine showed mild straightening of the normal cervical lordosis, which could have been due to spasm or positioning. (R. 499).  There was also mild spondylosis deformans of the mid to lower cervical spine, but no visible facture or subluxation. (R. 499).  She was once again referred for physical therapy. (R. 502).  Dr. Sperber, who saw Plaintiff on this date, concurred with the diagnosis of fibromyalgia and myofascial pain syndrome, but noted a concomitant musculoskeletal dysfunction as well. (R. 579).  Plaintiff had another physical therapy evaluation on her neck and back on June 17, 2011, in which she reported that she felt more pain when she was unable to sleep at night and had difficulty with activities that required her to move her shoulders because of weakness. (R. 623).  She was observed ambulating without an assistive device. (R. 623).  Her range of motion was within normal limits, but she had decreased right lateral flexion, 3+/5 strength in her shoulders, and 4/5 strength in her elbows. (R. 623).  She said she could walk two to three blocks but otherwise was limited by shortness of breath and knee pain. (R. 623).  She also reported difficulty carrying things, and stated that she could only climb one flight of stairs with difficulty. (R. 623-24).  She attended physical therapy sessions on June 22 and June 24, 2011. (R. 636-37).

On July 13, 2011, Plaintiff had an MRI on her left knee, which showed a posterior medial parameniscal cyst, but was inconclusive regarding whether Plaintiff had a meniscal tear. (R. 599-600).  There were also extensive cystic changes and surrounding soft tissue edema throughout

the lateral aspect of the infrapatellar fat pad, which could have been related to Hoffa's Disease. (R. 599).

The added records before the Appeals Council also showed continued treatment in 2011 and 2012, following the ALJ's decision. (R. 565-69, 581-98).

**E.  Testimony during July 20, 2011 Hearing before ALJ Heyman**

Plaintiff testified with the assistance of an interpreter at the July 20, 2011 hearing before ALJ Heyman. (R. 34-49).  She said that she received her GED from Bronx Community College, (R. 38), and last worked as a home attendant until January 23, 2010. (R. 41-42).  Plaintiff said that she had to stop working when she fell while on the job and hurt her knee and arm. (R. 42). She reported that she did not return to her job as a home attendant because "I wasn't feeling well, I was going to the therapy so every day I kept getting worse. And my job involved working with the lady and you know doing a lot of physical work." (R. 42-43).

Plaintiff traveled to the hearing with her sister on the train. (R. 38).  She explained that she was not always able to travel alone because the side effects of the pills she took made her feel dizzy and fall asleep. (R. 38).  She reported to be taking Mirtazapine, Lorazepam, Seroquel, Cymbalta, Mecoquin and a medication to regulate her blood pressure. (R. 38).  She said that the Mirtazapine only allowed her to sleep an hour or two. (R. 38).  She explained that she had high blood pressure, depression, chronic arthritis in her back, knee and arm, and could not sit or stand for too long. (R. 39).  She reported that she received treatment for her arthritic problems, including steroid/cortisone injections, at North Central Bronx Hospital and at the office of Dr. Krishna, Plaintiff's neurologist. (R. 40-41).

Plaintiff reported that she normally walked to church three times a week, although the distance was not far. (R. 43).  At church, Plaintiff took a course called "Learning to Live a Better

Life," attended a group session three times a week and helped out after mass on Sundays, talking with other people who were depressed. (R. 44). Plaintiff explained that she "fe[lt] better" at church because staying home all the time made her nervous. (R. 45). She said that sometimes she waited for her brother to drive her to church, but otherwise she walked. (R. 45). Plaintiff also reported visiting her family, (R. 46), and said that she sometimes cooked, shopped and went to the park, (R. 47). Plaintiff said that she traveled to Santo Domingo for her sister's funeral in October 2010, but implied that she had the assistance of family, stating "[a] sister of mine passed away . . . and so they took me because I wanted to go. She was always there for me." (R. 47).

Upon questioning by her representative, Plaintiff testified that she did not have much energy and she regularly just watched television, took a shower, ate, and went back to sleep. (R. 48). Plaintiff reported that she "fe[lt] very depressed because of what [was] happening to [her]." (R. 48). She said that she did not sleep at night because she was scared, and she often cried. (R. 48). She added that she was "always forgetting things." (R. 48).

## F. ALJ Heyman's Decision

ALJ Heyman applied the five-step approach in his September 16, 2011 decision. (R. 18-27). At the first step, ALJ Heyman found that Plaintiff had not engaged in "substantial gainful activity since January 23, 2010, the alleged onset date." (R. 20).[6] At the second step, ALJ Heyman determined that Plaintiff had the following severe impairments: spinal derangement, knee derangement and a mood disorder. (R. 20). At the third step, ALJ Heyman held that Plaintiff did not have a medically determinable impairment or a combination of impairments that were listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20). The ALJ considered listing 1.02 for joint dysfunctions and 1.04 for spine disorders but found that the severity for Plaintiff's

---

[6] With regard to Plaintiff's DIB claim, ALJ Heyman also found that Plaintiff met the insured status requirements through December 31, 2014. (R. 20).

impairments did not meet the criteria under those listings. (R. 21).  With regard to listing 12.04

for affective disorders, the ALJ noted his consideration of the "paragraph B" criteria and his

findings that Plaintiff had mild restrictions in activities of daily living, mild difficulties in social

functioning, at most moderate difficulties with regard to concentration, persistence or pace, and

no episodes of decompensation of extended duration. (R. 21-22).  ALJ Heyman also found that

the evidence failed to establish the presence of "paragraph C" criteria. (R. 22).

The ALJ then determined that Plaintiff had the RFC to perform unskilled, light work as

defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). (R. 22).  In assessing Plaintiff's RFC, the

ALJ held that Plaintiff's statements concerning the intensity, persistence and limiting effects of

her symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC

determination. (R. 23).  The ALJ discussed Plaintiff's allegation that she could not work because

of physical limitations resulting from back, neck and knee pain. (R. 23).

Regarding Plaintiff's physical limitations, the ALJ noted that an MRI of Plaintiff's

lumbosacral spine in January 2010 revealed a loss of lumbar lordosis and only mild lumbar

degenerative disc disease at L5-S1. (R. 23).  An additional MRI of the cervical spine on that date

revealed only mild cervical spondylosis with multilevel disostephtye complexes with mild

posterior disc bulge at C5-C6. (R. 23).  X-rays of Plaintiff's bilateral knees in October 2010

showed only mild degenerative changes and an x-ray of Plaintiff's left knee in May 2010 was

within normal limits. (R. 23).  X-rays of Plaintiff's right elbow and shoulder, and pelvis from

April 2009 also yielded negative results. (R. 23).  The ALJ noted that Plaintiff had received

treatment, including physical therapy, for her complaints of low back, neck, knee, and right

upper extremity pain, but that the records also demonstrated that she could ambulate well

independently, exhibited full range of motion in her knees, mild or no crepitus, and motor

strength of 5/5 in both lower extremities. (R. 23).  The ALJ reviewed the May 2010 physical examination of consulting physician Dr. Lathan, who observed that Plaintiff had a normal gait and stance, a full squat and was able to walk on her heels and toes without difficulty. (R. 23).  He recounted the results of the examination, noting that they were mostly unremarkable. (R. 23).

Regarding Plaintiff's mental health impairment, the ALJ noted that she began treatment in April 2010 but had no history of psychiatric hospitalizations. (R. 25).  He noted that the record lacked regular reports of treatment sessions with Dr. Ruiz, Plaintiff's treating psychiatrist. (R. 25).  He reviewed the consultative evaluation from Dr. Bougakov, dated May 2010, in which Plaintiff presented as cooperative, with an adequate manner of relating, fluent but tearful speech, adequate expressive and receptive language, coherent and goal-directed thought processes, impaired attention, concentration and memory due to emotional distress and depression, but average cogntive functioning. (R. 24).  He also noted the state psychological consultant's assessment, which ultimately found Plaintiff capable of simple work. (R. 24).

The ALJ found that Plaintiff's reported activities of daily living contradicted her allegation of disability. (R. 25).  He pointed to her ability to attend to self-care tasks, negotiate public transportation independently, shop, cook and perform household chores, watch television and read, socialize with friends in her neighborhood, walk to church and attend groups/classes three times per week, and to travel to Santo Domingo for a trip in October 2010. (R. 25).

Regarding opinion evidence, the ALJ said that he did not give significant weight to Dr. Krishna's June 2010 assessment that Plaintiff could not perform even sedentary work. (R. 24).  He justified this conclusion by pointing out that Dr. Krishna's opinion was not supported by treatment documentation, was inconsistent with the findings of Dr. Lathan, who observed Plaintiff just one month prior to Dr. Krishna, and conflicted with Plaintiff's activities of daily

living, which included walking, using public transportation, attending church groups three times a week and traveling to Santo Domingo. (R. 23-24). Instead, the ALJ gave significant weight to Dr. Lathan's assessment, which the ALJ found to be consistent with the evidence in the record and his findings upon evaluation. (R. 25).

Regarding Plaintiff's mental limitations, the ALJ did not give controlling weight to Dr. Ruiz's assessment that Plaintiff had poor to no ability to interact with supervisors, deal with work stresses, and maintain attention and concentration. (R. 25). The ALJ supported this conclusion by stating that these findings were not supported by any treatment documentation. (R. 25). He also noted that the assessment consisted of a check-off-box form and broad statements regarding Plaintiff's difficulty with memory and concentration but limited supporting clinical observations and findings. (R. 25). The ALJ also pointed to the lack of regular reports of treatment sessions, but indicated that the record "does not appear to be comprehensive." (R. 25). In contrast, the ALJ gave significant weight to Dr. Bougakov's assessment that Plaintiff could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, make appropriate decisions, relate adequately with others and deal with stress on a limited basis. (R. 24-25). The ALJ said that this assessment was consistent with the evidence in the record and with the "findings upon evaluation." (R. 25). The ALJ also gave weight to the state psychiatric consultant's opinion, as it was consistent with Dr. Bougakov's opinion. (R. 25).

At the fourth step, the ALJ determined that Plaintiff was not capable of performing her past relevant work as a home health aide. (R. 26). The ALJ noted that Plaintiff was a younger individual on the alleged onset date, had at least a high school education and was able to communicate in English. (R. 26). At the fifth step, the ALJ found that Plaintiff's additional

limitations had little or no effect on the occupational base of unskilled light work, and therefore that a finding of not disabled was appropriate under the framework of the Medical-Vocational Guidelines. (R. 27). Additionally, the ALJ noted that a significant number of jobs listed in the Medical-Vocational Rules 202.00(a) and (b) were unskilled occupations. (R. 27). The ALJ concluded that Plaintiff was not disabled. (R. 27).

## II. DISCUSSION

Plaintiff argues that ALJ Heyman's decision is erroneous as a matter of law and is not supported by substantial evidence. Specifically, Plaintiff contends that ALJ Heyman erred by: (1) failing to accord controlling weight to the assessment of Plaintiff's treating physician, Dr. Krishna; and (2) finding that Plaintiff retained an RFC for light work when such a determination is inconsistent with the assessments of Plaintiff's treating physicians and other evidence in the record. (Docket No. 22). In this regard, Plaintiff in particular takes issue with the ALJ's treatment of Dr. Bougakov's medical assessment and of Plaintiff's testimony that she went to church regularly and traveled to Santo Domingo on one occasion. (Docket No. 22). In opposition to the Plaintiff's motion and in support of her own motion, the Commissioner argues that ALJ Heyman comported with the treating physician rule in discounting the opinion of Dr. Krishna, and that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence. (Docket No. 25).

## A. Legal Standards

A claimant is disabled and entitled to disability benefits if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176

(2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)). The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "'and bears the burden of proving his or her case at steps one through four.'" *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (citation omitted).

## B. Standard of Review

When reviewing an appeal from a denial of Social Security benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quotation marks and citations omitted). If the findings of the Commissioner are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The substantial evidence standard "is still a very deferential standard of review—even more so than the 'clearly erroneous' standard.  The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (emphasis in the original) (quotation marks and citations omitted).  "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149 (citation omitted). Even if there is evidence on the other side, the Court defers "to the Commissioner's resolution of conflicting evidence." *Cage*, 692 F.3d at 122 (citation omitted).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.  Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quotation marks and citation omitted).

When evidence is presented to the Appeals Council, such evidence becomes part of the administrative record and is subject to judicial review by the district court. *Perez*, 77 F.3d at 45. Evidence submitted to the Appeals Council must (1) be new, (2) be material, and (3) "relate to the period on or before the ALJ's decision." *Id.* (summarizing 20 C.F.R. § 416.1470(b)).

## C.  The Treating Physician Rule

Plaintiff alleges that ALJ Heyman erred by failing to give controlling weight to the assessments of Dr. Krishna, Plaintiff's treating physician.  This argument is unpersuasive.  In determining an applicant's RFC, the ALJ must apply the treating physician rule, which requires

the ALJ to afford controlling weight to the applicant's treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Thus, "'[a] treating physician's statement that the claimant is disabled cannot itself be determinative.'" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003)).  Moreover, if there is substantial evidence in the record that contradicts or questions the credibility of a treating physician's assessment, the ALJ may give that treating physician's opinion less deference. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (refusing to give controlling weight to treating physicians' opinions, as they were not supported by substantial evidence in the record); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (same); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (same).

    To discount the opinion of a treating physician, the ALJ must consider various factors and provide a "good reason." 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).  These factors include:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency with the record as a whole; (5) the specialization of the treating physician; and (6) other factors that are brought to the attention of the Court. *See Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

    The Second Circuit has made clear that the ALJ need not "slavish[ly] recit[e] . . . each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Molina v. Colvin*, No. 13 Civ. 4701(GBD)(GWG), 2014 WL 2573638, at *11 (S.D.N.Y. May 14, 2014) (collecting cases).

What is required, however, is that the ALJ provide "good reasons" when not affording controlling weight to a treating physician's opinion. *Selian*, 708 F.3d at 419 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(c)(2)); *see also Petrie*, 412 F. App'x at 407 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) ("[W]here 'the evidence of record permits [the Court] to glean the rationale of an ALJ's decision, [the Court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'").

Dr. Krishna provided three assessments of Plaintiff's impairments, two of which post-dated the ALJ's determination. In the first, he reported that Plaintiff could occasionally lift and carry about one to ten pounds. (R. 347). He indicated that she could stand/walk for one to one-and-a-half hours in an eight hour work day and for fifteen to twenty minutes without interruption, and could sit for one to one-and-a-half hours in an eight-hour day and for thirty to thirty-five minutes without interruption. (R. 348). He said that she could occasionally climb and balance but never stoop, kneel, crouch, or crawl, and her ability to reach, handle, and pull/push were all affected by her impairments. (R. 348). In support of these assessments, Dr. Krishna pointed to Plaintiff's cervical and lumbosacral radiculopathy and chronic progressive neck and lumbosacral pain, and in particular, to evidence of Plaintiff's issues with range of motion, marked tenderness of the cervical and lumbar spine, and disc herniations at multiple levels, including the MRI/EMG/NCS records and Dr. Krishna's physical examinations.[7] (R. 347-49).

---

[7] Dr. Krishna's 2012 assessments were even more severe. (R. 638-48). He found that Plaintiff could occasionally lift and carry six to ten pounds. (R. 646). He indicated that she could stand/walk for less than thirty minutes in an eight hour work day and for fifteen minutes continuously before having to lie down, (R. 644), and could sit for one hour in an eight-hour day and for fifteen minutes continuously before needing to walk or stand before sitting again, (R. 643-44). He said that she could occasionally balance and reach, but never stoop. (R. 646). He stated that she used a cane for walking. (R. 647).

ALJ Heyman made clear that he did not give significant weight to Dr. Krishna's June 2010 assessment because it was not supported by treatment documentation and was inconsistent with other evidence in the record, namely the findings of Dr. Lathan, who examined Plaintiff one month prior to Dr. Krishna's assessment. (R. 23-24).  Additionally, he noted that Dr. Krishna's assessment conflicted with Plaintiff's reported activities of daily living, which included walking, using public transportation, attending church groups three times a week, and traveling to Santo Domingo. (R. 24).  Plaintiff argues that this was in error because Dr. Krishna's assessment was supported by diagnostic tests, physical therapy reports, emergency room records, and Plaintiff's testimony, and should have been given controlling weight. (Docket No. 22 at 3).

Dr. Krishna's assessment of Plaintiff's limitations relied entirely on Plaintiff's back and neck symptoms, and was inconsistent with the physical examination of Dr. Lathan, who indicated that Plaintiff' cervical and lumbar spine showed full flexion, extension, lateral flexion and full rotary movements bilaterally, (R. 306).  Dr. Lathan also found that Plaintiff's gait was normal, and she was able to walk on heels and toes without difficulty, had a full squat and normal stance, used no assistive devices, and did not require assistance changing for the exam, getting on or off the exam table, or rising from the chair. (R. 305).  Dr. Lathan noted that Plaintiff had certain moderate limitations, however his assessment, which was supported by his findings during the physical examination, was not nearly as restrictive as that of Dr. Krishna, and such substantial evidence contradicting Dr. Krishna's assessment was sufficient reason for the ALJ to decline to give the treating physician's assessment controlling weight.  Additionally, the majority of the treatment records before the ALJ indicated treatment for Plaintiff's knee pain, with the neck and back related records supporting moderate limitations, but not a severe loss of function as reflected in Dr. Krishna's assessment.

In addition, records submitted before the Appeals Council continue to show moderate limitations in support of Dr. Lathan's assessment, but in contradiction to Dr. Krishna's assessment.  An assessment of Plaintiff's cervical spine on May 26, 2011 showed mild straightening of the normal cervical lordosis, which could have been due to a spasm or positioning. (R. 499).  There was also mild spondylosis deformans in the mid to lower cervical spine. (R. 499).  However, on June 17, 2011, her range of motion was found to be within normal limits. (R. 623).   As such, the ALJ did not err in declining to give Dr. Krishna's opinion controlling weight, when substantial evidence supported the contradictory assessment of Dr. Lathan. *See McDonaugh v. Astrue*, 672 F. Supp. 2d 542, 567 (S.D.N.Y. 2009) ("the ALJ was permitted to assign less weight to [the treating physician's] opinion than to other opinions in the record that were better supported by the objective medical findings and, in general, were more consistent with the evidence.") (citing 20 C.F.R. §§ 404.1527(f), 416.927(f); *Schisler,* 3 F.3d at 568; *Punch v. Barnhart,* No. 01 Civ. 3355(GWG), 2002 WL 1033543, at *11–13 (S.D.N.Y. May 21, 2002)).

In declining to give the opinion significant weight, the ALJ noted that the assessment was not supported by treatment documentation, was inconsistent with the findings of Dr. Lathan, and conflicted with Plaintiff's reported activities of daily living, which included walking, using public transportation, attending church groups three times a week, and traveling to Santo Domingo. (R. 24).  I respectfully recommend that these are adequate reasons to discount Dr. Krishna's assessment, and that the ALJ did not err by not giving it controlling weight.[8]

---

[8] The record also contains assessments from Plaintiff's treating physician, Dr. Ruiz. (R. 355-57, 458-59, 460-62). However, the ALJ also discounted these assessments, noting that they were not supported by any treatment documentation and consisted of a check-off-box form and broad statements regarding difficulties with memory, but limited supporting clinical observations, and pointing out that there was a lack of regular reports of treatment sessions with Dr. Ruiz in the record. (R. 25).  Plaintiff does not assert that the ALJ erred in failing to give controlling weight to Dr. Ruiz's assessments, and, therefore, the Court has not considered the issue.

**D.  Substantial Evidence**

Next, Plaintiff contends that the ALJ's determination that Plaintiff retained an RFC for light work was not supported by substantial evidence because it was inconsistent with the assessments of Plaintiff's treating physicians and other evidence in the record. (Docket No. 22). In this regard, Plaintiff in particular contests the ALJ's treatment of Plaintiff's testimony that she went to church regularly and traveled to Santo Domingo on one occasion, and argues that the ALJ implicitly rejected the assessment of consultative examiner Dr. Bougakov, despite his assertion that he gave the opinion significant weight.

I have reviewed the record and find that substantial evidence supports the ALJ's determination of Plaintiff's RFC, and that his treatment of Dr. Bougakov's evaluation and Plaintiff's activities of daily living was not in error.  Beginning with Plaintiff's physical impairments, as discussed in Section III(C), *supra*, Dr. Lathan evaluated Plaintiff's gait as normal and noted that she was able to walk on heels and toes without difficulty, had a full squat and a normal stance and used no assistive devices. (R. 305).  She did not require assistance changing for the exam, getting on or off the exam table, or rising from a chair. (R. 305).  Her cervical and lumbar spine showed full flexion, extension, lateral flexion and full rotary movements bilaterally. (R. 306).  She had a full range of motion in her hips, knees and ankles bilaterally, but complained of left knee joint pain on full range of motion. (R. 306).  An X-ray of her left knee showed results within normal limits. (R. 306).  Dr. Lathan concluded that Plaintiff had a stable prognosis, but moderate restrictions for lifting, pushing, pulling, overhead reaching, stooping, squatting, prolonged standing, and prolonged walking. (R. 307).  These moderate restrictions are consistent with an RFC for light work. *See Scouten v. Colvin*, No. 15-CV-76S, 2016 WL 2640350, at *4 (S.D.N.Y. May 10, 2016) ("moderate limitations . . . have often been

found to be consistent with an RFC for a full range of light work"). As such, Dr. Lathan's opinion constitutes substantial evidence in support of the ALJ's assessment that Plaintiff could perform light work. *See Mongeur*, 722 F.2d at 1039 (a consultative examiner's assessment may constitute substantial evidence). Additionally, Dr. Lager's assessment on May 26, 2010 indicated that Plaintiff had a normal gait, and although she had tenderness upon palpation, she was found to have a full active range of motion in her knee. (R. 429). She was again found to have a full range of motion with motor strength of 5/5 in the lower extremities and 4/5 in the quadriceps and hamstrings on October 8, 2010. (R. 444). Her range of motion was within normal limits again on November 15, 2010. (R. 446). The physical RFC assessment concluded that Plaintiff retained the ability to perform light work, further supporting the ALJ's determination regarding Plaintiff's physical impairments. (R. 335). Finally, x-ray evidence submitted before the Appeals Council continued to show mild degenerative joint disease in Plaintiff's knee, but otherwise was within normal limits. (R. 510).

The Court notes that the January 28, 2010 MRI of Plaintiff's lumbar spine showed a muscle spasm and mild lumbar degenerative disc disease, (R. 221), while the MRI of her cervical spine revealed  torticollis to the right, mild cervical spondylosis with multilevel disc osteophyte complexes and a mild posterior disc bulge, (R. 223). Plaintiff also demonstrated cervical and lumbar tenderness on April 16, 2010 at a physical examination before Dr. Luke, (R. 262), and tenderness in her parascapular region on September 8, 2010, (R. 432). Additionally, an MRI from July 2011 was inconclusive regarding whether Plaintiff had a meniscal tear, but did show cystic changes and soft tissue edema in Plaintiff's knee. (R. 599). Nonetheless, the Court must uphold the ALJ's determination if it is supported by substantial evidence, even though contrary

evidence may exist in the record. *Mitchell v. Astrue*, No. 07 Civ. 285(JSR), 2009 WL 3096717, at *14 (S.D.N.Y. Sept. 28, 2009).

Turning to Plaintiff's mental impairments, the ALJ concluded that Plaintiff retained the RFC to perform unskilled jobs.  Substantial evidence supports this conclusion.  At a FEGS assessment on April 28, 2010, Plaintiff was found to have only mild impairments in her ability to follow work rules and accept supervision, and only moderate impairments in her ability to deal with the public, maintain attention, relate to coworkers and adapt to change and stressful situations. (R. 286).  Dr. Bougakov conducted a psychiatric evaluation of Plaintiff in May 2010, and found that her attention and concentration and recent and remote memory skills were impaired, but her intellectual functioning was in the average range, her general fund of information was somewhat limited, her insight was poor to fair and her judgment was fair. (R. 301-02).  He concluded that she was able to follow and understand simple directions and instructions and perform simple tasks, although he found that she was limited in her ability to learn new tasks and to perform complex tasks. (R. 302).  This is consistent with the ALJ's conclusion that she would be able to meet the mental demands of unskilled work, which is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." *Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2*, SSR 83-10, 1983 WL 31251, at *7 (S.S.A. 1983).  Dr. Bougakov also noted that Plaintiff could maintain attention and concentration, maintain a regular schedule, make appropriate decisions, relate adequately with others, and deal with stress, but all on a limited basis, (R. 302), however any such limitations in concentration, dealing with stress, and socialization have been found to be consistent with an RFC for unskilled work. *See Abar v. Colvin*, No. 7:15-CV-0095(GTS/WBC), 2016 WL 1298135, at *5 n.8 (N.D.N.Y. Mar. 31, 2016)

(citing cases).  Additionally, the state agency consultant's assessment that Plaintiff could perform a job with simple tasks, (R. 328), further supports the ALJ's determination.

Finally, regarding Plaintiff's activities of daily living, Plaintiff reported that she could walk two to three blocks, (R. 623), and said that she was able to wash dishes and clothes, sweep/mop the floor, vacuum, watch television, make her bed, shop for groceries, cook meals, read, socialize, get dressed, bathe, use the toilet and groom herself when she "fe[lt] good," (R. 256), but at another instance she reported that she could perform all activities of personal care but her daughter did the cleaning, laundry and shopping, (R. 305).  She testified that she was able to take public transportation, (R. 38), and that she generally walked to church three times a week, although the distance was not far, (R. 43).  At church, Plaintiff took a course, regularly attended group sessions, and helped out after mass on Sundays. (R. 44).  She also reported that she traveled to Santo Domingo to attend her sister's funeral in October 2010. (R. 47).  These activities of daily living further support the ALJ's determination that Plaintiff was capable of light work, and the ALJ did not err in considering these activities and the extent to which they casted doubt on Plaintiff's assertion of disability.

Plaintiff is correct that the Second Circuit has noted that when an individual "chooses to endure pain in order to pursue important goals . . . it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks and citation omitted).  The Court agrees that Plaintiff's one-time trip to Santo Domingo to attend her sister's funeral, especially when Plaintiff implied that she received assistance during the trip, is insufficient to demonstrate an ability to withstand such physical demands on a regular basis.  However, the regulations require the ALJ to consider Plaintiff's daily activities as one factor in

-30-

determining the severity of Plaintiff's impairments. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ did not err in considering Plaintiff's relatively active lifestyle as part of his determination that she was capable of unskilled, light work.  In sum, I respectfully recommend that substantial evidence supports the ALJ's determinations regarding Plaintiff's RFC.

## III.  CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that Plaintiff's motion for judgment on the pleadings should be denied and the Commissioner's cross-motion should be granted, and the case be dismissed.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kenneth M. Karas at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Kenneth M. Karas and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be

rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   October 5, 2016
         White Plains, New York

                                        **RESPECTFULLY SUBMITTED,**


                                        _____
                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge